

FILED

07 SEP 25 PH 12: 09

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**HARRIETT MASON**

      Plaintiff,

                                              Case No. 99-762-Civ-T-17E

vs.

**CITY OF TAMPA, FLORIDA and the**
**TAMPA POLICE DEPARTMENT,**

      Defendants.

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

COMES NOW Plaintiff, Harriett Y. Mason, and responds to Defendant's Motion for Summary

Judgement and states the following:

1) Plaintiff can make out a prima facie case under the familiar multi-pronged promulgated in

    McDonnell Douglas v. Green, 411 U.S. 792, 93 S. Ct. 1817 (7973).

    a) Plaintiff was subjected to <u>adverse employment action:</u>

        Plaintiff received negative evaluations, undesirable shift changes, harassment and retaliation,

        reprimands, psychological evaluation, loss of police powers, "demoted" from her street police

        duties to administrative secretarial duties (no loss of pay), suspension, hostile work environment,

        subjected to ridicule, embarrassment and humiliation. Finally these actions by Plaintiff's

        employer led to Plaintiff's resignation.



b) Defendants <u>treated similarly situated employees of a different race more favorably</u>. These

employees were similarly situated in all relevant respects.

Both Plaintiff and white male officer, Roy Paz, had been employed with the City of Tampa

Police Department approximately the same length of time, Plaintiff having been hired four

months previous to Officer Paz. Both Plaintiff and Officer Paz held the same job, performing

the same duties of a street patrol officer.

Although Plaintiff had stated that Officer Paz was an excellent officer and that Officer Paz had

participated in activities that had been given media attention, Plaintiff was not suggesting that

Officer Paz was more qualified or more deserving of favorable treatment by Defendants.

Plaintiff was also an excellent officer as documented in her 1997-98 Police Performance

Evaluation completed by Cpl. Northrop.

Both Plaintiff and white male officer, Roy Paz, volunteered and were selected for assignment to

the City of Tampa Community Oriented Policing (COP) squad, working a dayshift assignment

under the supervision of Cpl. H. Northrop in the Community Affairs Bureau. Officer Paz

voluntarily left the position, but later wanted to return to the Firehouse Program, working a

dayshift assignment. Plaintiff was transferred from the Community Affairs Bureau to the Patrol

Division Firehouse Program under the supervision of Lt. McNamara and Sgt. J. Counsman,

working an evening assignment, while Officer Paz was returned to the Firehouse Program

working a dayshift assignment. Lt. McNamara had knowledge that Officer Paz wished to

return the Firehouse Program and had knowledge that both Plaintiff and Officer Paz wished to

be assigned dayshift positions for *personal reasons*. (McNamara Request for Admissions #15,

Paz Request for Admissions #15)

Upon Plaintiff's expressing displeasure via her chain of command with the transfer from the

dayshift assignment to the evening shift and Officer Paz receiving a dayshift assignment; as well

as Plaintiff's husband lodging a complaint of racism in the Mayor's Office, Plaintiff was

disciplined for not reporting sickness and transferred from the Firehouse Program to a midnight

shift working street patrol duties, under the supervision of Sgt. W. D. Pricher, while Officer Paz

was transferred back to the Firehouse Program working a dayshift assignment, eventually

returning to the Community Affairs Bureau, under the supervision of Cpl. H. Northrop, where

Officer Paz is currently working a dayshift assignment. (Paz Req. for Admissions #23)

Plaintiff and the members of Squad 66, under the supervision of Sgt. W.D. Pricher were

similarly situated in all relevant respects.  Plaintiff, though, was the only Black officer on this

squad.  Plaintiff and the members of Squad 66 performed the same duties as street patrol

officers, and were held to the same standards and expectations by supervisors.

Members of Squad 66 were treated more favorably than Plaintiff.  Upon Plaintiff's transfer

to Squad 66, Plaintiff was shunned by her supervisor, Sgt. Pricher.  Sgt. Pricher never met

with Plaintiff to get to know Plaintiff and to discuss Plaintiff's career goals, nor training or

in-service class opportunities.  Plaintiff was not supervised in the field, nor did

Plaintiff benefit from Sgt. Pricher's experience and personal supervision. (see Pricher

Philosphy I.A. complaint 90-40, pg. 67)

Plaintiff was subjected to heightened scrutiny upon her transfer to Squad 66.  The members

of Squad 66 were ordered by Sgt. Pricher to provide any information in reference to any calls

they had been on with Plaintiff (Moore Depo. Pg 9) and any observations of Plaintiff's

activities (Pricher Depo.pg 90), even though Sgt. Pricher had previously stated, contradicting

himself, that the Officer's statements were not solicited.  "They came to me on their own."

(Pricher Depo pg. 23)

Sgt. Pricher authored a 9 page document accusing Plaintiff of having violated Department Policy

relating to untruthfulness, insubordination, cowardice, attention to duty and incompetence.

Plaintiff was never given the benefit of the doubt.  Plaintiff had only been on the Squad *7 nights*!

Sgt. Pricher believed the reports of his Squad members without the benefit of any investigation,

to the extent of calling Plaintiff a liar, when Sgt. Pricher admittedly did not know whether

Plaintiff had lied or not. (Allegations/Pricher Depo. Pg. 39).  Sgt. Pricher "absoloutely" knew

that Plaintiff could be fired for untruthfulness. (Pricher Depo. pg 37)

When asked whether or not he had read Plaintiff's response to the allegations that he had

authored, Sgt. Pricher stated that his concern was not for Plaintiff's plight but rather was

for "his squad." ("I had more pressing problems in dealing with the day to day operation

of my squad." (Pricher Depo pg. 60)  Plaintiff was still under the supervision of  Sgt. Pricher and

a member of this squad.

Plaintiff and Officers M. Vazquez and Officer G.A. Pruitt, both white males, were

similarly situated in all relevant respects.  Both Plaintiff and these officers were under the

same supervision, Sgt. Pricher, and the same chain of command.

Officer Pruitt made a formal complaint with the Internal Affairs Bureau against his

chain of command, specifically Lt. Miller, alleging that Lt. Miller had used profanity against

him.  (I.A. Complaint # 98A-766)  This complaint was made by Officer Pruitt on the heels

of an investigation into Officer Pruitt's alleged mishandling of suspect property.

Officer Vazquez made a formal complaint with the Internal Affairs Bureau against his chain

of command, specifically Corporal Packer, alleging that he had observed Cpl. Packer use

excessive force against a suspect.  The complaint against Cpl. Packer was not sustained.  There

were no corroborating witnesses to Officer Vazquez's account of the events, even though

Officer Vazquez gave recorded testimony that he could feel the vibration (of the ground) of

Corporal Packer hitting the suspect's head to the ground!

Both of these officers complaints were given due process and fully investigated by the Internal

Affairs Bureau.  The complaints were not forwarded to Administration for review and

consideration.  It was not determined that these allegations were "just a matter of perception"

and that an investigation would not be "investigated or entertained".

It was not determined that these complaints were just a "witch hunt" or that the only reason

these officers were making complaints was because they had been disciplined. In fact, two

officers had testified in Officer Vazquez/Corporal Packer case that after being verbally

reprimanded by Corporal Packer, Officer Vazquez stated that he was going to "get him (Corporal

Packer)." These statements were made prior to Officer Vazquez lodging a complaint against

Corporal Packer.  It was not determined that there was no basis for these Officers' complaints as

it was determined in the case of Plaintiff's complaint.

Defendants did treat white employees similarly situated as Plaintiff more favorably.


c)  Plaintiff was <u>qualified for the job she held.</u>

Plaintiff possesses a 4 year BA degree from Vanderbilt University (1985), which more than

met the hiring qualifications as of September 1994 when Plaintiff was hired.  New hirees are

now required to have only an associates/2 year degree.  Plaintiff met all the hiring

qualifications, and passed all applicable tests. Plaintiff continually increased her scores on her

annual Police Performance Evaluations,  as well as Physical Abilities Test.

(Plaintiff did dispute her 1998-99 evaluation after receiving a negative evaluation after Plaintiff

engaged in protected activity)

Plaintiff had completed more that 219 hours of advanced training classes.  Plaintiff was a

Police officer for more than 4 years and had been assigned to the Community Oriented Policing

Firehouse Squad for approximately two years prior to her resignation.  Plaintiff had completed

a 120 hour class and was certified as a Crime Prevention Practitioner.

Plaintiff had taken and passed the 1996 Sergeants Promotional exam, with only 2 years on

the Department!  Plaintiff had received several commendations during her tenure with the

Department.  Plaintiff had more seniority than several of the officers that were treated more

favorably than Plaintiff.  Prior to June 1998, Plaintiff had no disciplinary history.

There is no question that Plaintiff was more than qualified for the job!

To discredit the Defendants reason, the "Plaintiff must demonstrate 'such **weaknesses,**

**implausibilities**, **inconsistencies**, **incoherencies**, or **contradictions** in the (defendant's)

proffered legitimate reasons for its action that a reasonable fact finder could find (all of

those reasons) **unworthy of credence**." Watkins 153 F. 3d at 1314 (quoting Combs v.

Plantation Patterns, 106 F. 3d 1519, 1538 (11th Cir. 1997) internal quotations marks and

Citation omitted), cert. Denied, 522 U.S. 1045, 118 S. Ct. 685 (1998))

The evidence in record does show  that the reasons proffered by Defendants are weak,

implausible, inconsistent, incoherent and contradictory, and unworthy of credence!

In a July 1999 document, Defendants stated that three (3) officers, Plaintiff, Officer Roy Paz

and Officer Samuel Rojka, both white males, were all assigned to dayshift position under

the control of the Community Affairs Division; and that after the restructuring of the

department the 3 officers were transferred to night shift.

This statement, which was in response to Plaintiff's complaint of race discrimination filed

with the City of Tampa Human Rights Office, contradicts with Lt. McNamara's admission

that after the March 1998 Departmental reorganization, the only **two (2)** officers affected by

this change were Plaintiff and Officer Samuel Rojka, and that Officer Paz was not working

a dayshift assignment at this time.  (McNamara Request for Admissions # 4-6)

Lt. McNamara admitted that Officer Paz had previously been assigned as a dayshift officer

to the Community Affairs Bureau along with Plaintiff and that Officer Paz voluntarily

left this assignment and was replaced by Officer Rojka. (McNamara Request for Admission,

#8-10)

Furthermore Lt. McNamara admitted that _prior_ to Plaintiff's transfer to the evening shift, he

became aware that Officer Paz wanted to be re-assigned to a Firehouse dayshift position,

and upon being transferred Plaintiff was assigned to the evening shift working 1400 hours

until 0125 hours, while Officer Paz worked mostly dayshift hours.

After Plaintiff's husband made the complaint of race discrimination in the Mayor's Office

March 1998, Lt. McNamara transferred Plaintiff to the late midnight shift under the supervision

of Sgt. Pricher, working from 1900 hours until 0725 hours. The reasons proffered for

Plaintiff's transfer to this undesirable shift and away from an opportunity to work a day shift

assignment any time soon, were not legitimate and in fact were **inconsistent, incoherent and**

**contradictory.**

In the July 1999 document in response to Plaintiff's racial discrimination complaint (THRO)

Defendants stated that Lt. McNamara had transferred Plaintiff to the late midnight shift

because her performance as a Firehouse Officer was deficient.  He stated that he had discussed

this with Plaintiff and that Plaintiff agreed to the transfer.

Yet, **contrary** to this statement, Lt. McNamara later admitted that Plaintiff was not transferred

because of a performance deficiency and that he had no documentation of any performance

deficiency by Plaintiff.

Lt. McNamara stated that Plaintiff needed more supervision, yet admitted that he possessed no documentation that Plaintiff needed more supervision. That Lt. McNamara believed that the transfer would benefit Plaintiff's career is **implausible**, in that Lt. McNamara admitted that he did not request and review Plaintiff's previous performance evaluations nor Plaintiff's personnel file, and as Plaintiff had never worked previously under Lt. McNamara's command, Lt. McNamara could not have known Plaintiff and what was best for Plaintiff's career.

Plaintiff asserts that Lt. McNamara told her that the Department errs by allowing young officers to be assigned to specialty squads rather than allowing them to remain on the "street" for a period of time, yet Lt. McNamara had other young officers on the Firehouse Squad, including Officer Paz who was less senior than Plaintiff. Defendants offered Plaintiff no plausible or legitimate reason for the transfer and has proffered none here.

**Contrary** to Defendants position, Plaintiff can adduce evidence that Lt. McNamara and other of Plaintiff's supervisors knew or should have known of complaints of racial discrimination made in the Mayor's Office by Plaintiff's husband as well as that made by Plaintiff in the Tampa Human Rights Office.

It is highly **unlikely** and **implausible** that a neighbor of Dr. Skotko may have known Curtis Lane or someone else in the Mayor's Office and therefore discussed information about Plaintiff with Dr. Skotko relative to a complaint of race discrimination. A reasonable fact-finder can adduce from the evidence that this information did indeed "filter down to the department":

    a) Curtis Lane admitted that he informed a representative of the police department that Plaintiff's husband had visited the Mayor's Office regarding "issues" regarding Plaintiff's employment. (Lane Request for Admissions, #19)

b)  Chief Holder stated that he "vaguely remember in conversation with someone, probably a member of my staff, of Officer Mason's husband complaining to the Mayor about the particular transfer, but I don't have any other personal knowledge." (Holder Depo. Pg. 10-11)

c)  In response to the question "You had knowledge she (via Plaintiff's husband) made complaints in the Mayor's Office?", Deputy Chief Taylor stated, "I saw some things on that with the same unfounded accusations that had already been investigated and determined to be without basis, yes." (Taylor Depo., pg. 98)

d)  Lt. McNamara admitted that he became aware at some point that a complaint had been made in the Mayor's office, and that he could not remember if he was advised of this complaint by Deputy Chief Taylor or Deputy Chief Bushell.  (Request for Admissions #18, 19)

e)  Sgt. Pricher stated that "George McNamara and I go back. . . we have a long-standing personal relationship" and that he had a telephone conversation with Lt. McNamara about Plaintiff prior to Plaintiff's transfer to Sgt. Pricher's squad, and that they discussed Plaintiff's "I don't care attitude." (Pricher Depo pg. 10-11) As a matter of fact, Sgt. Pricher stated in his 9-page document (Allegations) that he had spoken with Lt. McNamara and Sgt. Counsman and that  he was told by McNamara and Counsman that Plaintiff had been transferred to his squad because of an "attitude problem".

This is in **contradiction** with Lt. McNamara's denial that he told Sgt. Pricher

that the transfer of Plaintiff was because of an "attitude problem". (Request for

Admissions, #44)

Although Sgt. Pricher denied having knowledge of the complaint in the Mayor's

Office or any complaint of discrimination made by Plaintiff, a reasonable fact-

finder can adduce that much more than "osmosis" was involved in the transmission

of information.

Furthermore, Lt. Miller, Sgt. Pricher's supervisor, stated that he had knowledge

of the discrimination complaint made in the Tampa Human Rights Office by

Plaintiff. In response to whether or not he had knowledge of the complaint, Lt. Miller

stated, "That was a rumor. . . " (Miller Depo. Pg 84)

Defendants stated in the July 1999 document (TOHR inquiry) that they had no knowledge of

complaints of race discrimination involving Sgt. Pricher, yet Chief Holder admitted that he was

Captain of the Internal Affairs Bureau in 1990 when Sgt. Pricher and all the all white members

of his squad were disciplined for unconstitutional activities involving race discrimination.  Chief

Holder admitted several times that he remembered the investigation which was significant

in that this squad was disbanded as a result of the charges and investigation.  Yet Defendants

refused to take action after Plaintiff had made formal complaints of race discrimination by Sgt.

Pricher.

In Sgt. Pricher's 1997-98 performance evaluation, Lt. Miller stated that in regards to a white

male officer, Mark Vazquez, who was also on Sgt. Pricher's squad, that Officer Vazquez

"has the skills to do good police work.  For whatever reason, he was not able to put them in

the proper sequence, a line which oftentimes left reports incomplete and investigations

unfulfilled.  Over a period of time, Sgt. Pricher worked with him and it culminated in. . .

where he did a good job . . . " (Miller Depo. Pg 85)

Although Lt. Miller stated that Sgt. Pricher had initiated discipline against Officer Vazquez, he stated that he could not recall specifically what they were.  Lt. Miller admitted that Sgt. Pricher had never initiated allegations against Officer Vazquez like those made against Plaintiff.  Miller Depo pg. 85, 86)

As to the statement Sgt. Pricher made in the 1990 "Squad One Investigation" (IA Complaint #90-40, pg. 67), Pricher stated that "I tried to get to know everybody on my squad on a personal level where I could supervise personally and not generically.  I wanted to know who was an outstanding employee and I wanted to know who wasn't.  I wanted to know what training they needed.  I wanted to know their career goals and I wanted to be able to address everyone of those and be able to make the best possible police officers that I could . . . " Sgt. Pricher did not apply this philosophy to Plaintiff, although Sgt. Pricher stated that this was his philosophy in 1990 and this is his philosophy today.  (Pricher Depo pg. 7-8)

In his 1994-95 evaluation, Major Siling states, "Sgt. Pricher usually makes decisions based on facts supported by tangible evidence and does not let his personal feelings or emotions dictate actions." (Pricher Depo. pg. 91)  Although Sgt. Pricher stated that his personal feelings or emotions was not involved in his dealings with Plaintiff, Captain Stanley, Sgt. Pricher's supervisor, stated regarding the allegations authored by Sgt. Pricher, ". . . I think that the Sergeant (Pricher) initially responded from an emotional level." (Stanley Depo. pg. 19)

Sgt. Pricher stated that he could not recall specifically, in his 18 years of supervision, having ever authored a letter such as the one addressing Plaintiff, alleging violation of Department Policy as it relates to untruthfulness, insubordination, cowardice, inattention

to duty and incompetence.  He could only recall having brought one other officer to

question on the issue of incompetence, a **Hispanic** male officer!

The evidence shows that Defendants' actions were not just mere "bad business decisions" nor were

Defendants just "mistaken or erroneous" in taking the actions about which Plaintiff complains, but

rather the Defendants placed themselves above the law, disregarding even their own policies and

procedures.  Defendants acted with malice and reckless indifference to Plaintiff's federally protected

rights!


There is evidence that Defendants knew what constituted unlawful employment practices and that

Defendants systematically retaliated against Plaintiff over an eight month period because Plaintiff

had voiced complaints and had filed employment discrimination charges and Defendants attempted

to discredit Plaintiff by "papering" her personnel file.

Plaintiff can show evidence of a causal connection between complaints of race discrimination and

other complaints made by Plaintiff and the adverse actions by Defendants against Plaintiff.

Plaintiff has already established that her supervisors knew or should have known of the complaints

made by Plaintiff including that made in the Mayor's Office.

The adverse actions against Plaintiff would not have happened but for the complaints made by

Plaintiff and Plaintiff's husband and the evidence in record is sufficient for a reasonable jury to

support this finding.

Accordingly, Plaintiff is entitled to judgement in her favor on all of her claims.

Respectfully submitted,

Harriett Y. Mason
Plaintiff, *pro se*
P.O. Box 291692
Tampa, FL  33687
(813)985-1133

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was furnished by mail to the Office of Thompson, Sizemore & Gonzalez, Suite 200, 109 North Brush Street, Tampa, Florida 33602, this 25th day of September 2000.